IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| CHRISTOPHER JANIS, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL CASE NO. 2:25-cv-283-ECM |
| ) | [WO] |
| CARTEL OF THE SUNS, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION and ORDER**

Now before the Court is the Plaintiffs' motion for alternate service of process on Defendants Nicolas Maduro Moros ("Maduro") and Tareck Zaidan El Aissami Maddah ("El Aissami"). (Doc. 9). Upon consideration, and for good cause, the Court finds the motion is due to be GRANTED in part and DENIED in part.

**I. BACKGROUND**

This case arises out of alleged acts of international terrorism involving the Cartel of the Suns, Maduro, and El Aissami (collectively, the "Defendants"): the targeted shooting down of a plane occupied by United States nationals, and the kidnapping, torture, and murder of survivors. (*See* doc. 1 at 1–2, paras. 1–2).[1] The Plaintiffs allege the following. The Cartel of the Suns, run by Maduro and El Aissami, is an international narcotics trafficking conspiracy with members in the Revolutionary Armed Forces of Colombia ("FARC"). (*Id.* at 1, para. 1). In 2003, a plane manned by Thomas Janis, Thomas Howes,

---

[1] For clarity, the Court refers to the document and page numbers generated by CM/ECF.

Keith Stansell, and Marc Gonsalves, was shot down "as part of FARC's continuing narcotics conspiracy with the [Defendants]." (*Id.* at 2, para. 2). Following the plane crash, FARC executed Thomas Janis planeside, captured Thomas Howes, Keith Stansell, and Marc Gonsalves, and held the three survivors hostage, "tortur[ing] them in the Colombian and Venezuelan jungles for over [five] years." (*Id.*). The Plaintiffs seek civil damages against the Defendants under the Anti-Terrorism Act ("ATA"), 18 U.S.C. §§ 2333(a), (d)(2). (*Id.* at 2, para. 3).

Since filing, the Plaintiffs have been able to serve the Cartel of the Suns by an incarcerated senior member in the United States. (*See id.* at 8, para. 32; doc. 10). However, Maduro and El Aissami are fugitives from the United States (*see* docs. 9-1 & 9-2), located in Venezuela (*see generally* doc. 9), and remain unserved. The Plaintiffs seek authorization to serve Maduro and El Aissami "by email and/or direct message/text over social media." (Doc. 9 at 1).

## II.  JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this matter pursuant to 18 U.S.C. § 2338. Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 18 U.S.C. § 2334(a).

## III.  APPLICABLE LAW

Federal Rule of Civil Procedure 4(f) permits service on individuals in foreign countries "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of

Judicial and Extrajudicial Documents" or "by other means not prohibited by international agreement, as the court orders." FED. R. CIV. P. 4(f)(1), (3).

The United States is a signatory to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents ("Hague Convention"). Convention Done at the Hague November 15, 1965, Feb. 10, 1969, T.I.A.S. No. 6,638 [hereinafter *Hague Convention*]. The Hague Convention applies "in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad." *Hague Convention*, art. 1. "[C]ompliance with the [Hague] Convention is mandatory in all cases to which it applies . . . ." *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 705 (1988). "For a method of service to comply with the [Hague] Convention, the method must be either (1) affirmatively authorized, or (2) not prohibited under the circumstances." *Duong v. DDG BIM Servs. LLC*, 700 F. Supp. 3d 1088, 1091–92 (M.D. Fla. 2023) (citing *Water Splash, Inc. v. Menon*, 581 U.S. 271, 273 (2017)). Any method must also comport with due process and Rule 4(f). *Id.* at 1092.

## IV. DISCUSSION

Venezuela is a signatory to the Hague Convention. *Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*, HAGUE CONF. ON PRIV. INT'L L., https://www.hcch.net/en/instruments/conventions/status-table/?cid=17 (last visited Dec. 17, 2025). The Hague Convention's purpose as a "multilateral treaty is to simplify, standardize, and generally improve the process of serving documents abroad." *Water Splash*, 581 U.S. at 273. "The primary innovation of the [Hague] Convention is that it

3

requires each state to establish a central authority to receive requests for service of documents from other countries." *Volkswagenwerk*, 486 U.S. at 698. After receiving a request for service, the central authority "must serve the documents by a method prescribed by the internal law of the receiving state or by a method designated by the requester and compatible with that law. The central authority must then provide a certificate of service that conforms to a specified model." *Id.* at 699 (internal citations omitted).

Though Venezuela objects to transmission of documents through postal channels, it accepts service on nationals within its borders through its Ministry of Popular Power for Foreign Affairs ("Venezuela's Central Authority"). *Venezuela Central Authority & Practical Information*, HAGUE CONF. ON PRIV. INT'L L., https://www.hcch.net/en/states/authorities/details3/?aid=280 (last visited, Dec. 17, 2025). It does so at no cost, with a processing time of six months to a year, providing service in Spanish, English, and Portuguese. *Id.* There are two public-facing emails, several telephone lines, and three contact personnel for Venezuela's Central Authority. *Id.* In theory, then, international service within Venezuela should be relatively straightforward

But in practice, service through Venezuela's Central Authority is largely impossible. One 2021 declaration provided by the Plaintiffs from Maria J. Gutierrez, a certified process server, indicates that she attempted to serve individual defendants in Venezuela pursuant to the Hague Convention and that "the Central Authority in Venezuela responded that they 'do not receive anything from the United States of America.'" (Doc. 9-3 at 3). Indeed, a survey of federal court opinions shows that Venezuela's Central Authority has repeatedly declined to issue certificates of service in cases brought by

American plaintiffs.[2]  A recent experience within the Eleventh Circuit is instructive.  In *Osio v. Maduro*, the district court required the plaintiffs to serve defendants, including Maduro, via Venezuela's Central Authority. 2021 WL 1564359 (S.D. Fla. Apr. 21, 2021). A year and a half later, service had still not been effectuated, and Venezuela's Central Authority stated it "would not accept any service packages coming from the United States." *See* 2022 WL 17583631, at *3 (S.D. Fla. Sep. 26, 2022) (citation omitted).  In the interim,

---

[2] *See, e.g.*, *Isaac Indus., Inc. v. Petroquimica De Venezuela*, S.A., 127 F.4th 289, 294 (11th Cir. 2025) ("[T]he process server confirmed that Venezuela's Central Authority received the process documents. Silence followed. The Central Authority never confirmed that it executed service to the oil companies or certified receipt of service, as required by the Hague Service Convention."); *LS Energia Inc. v. Corporacion Electrica Nacional S.A.*, 2023 WL 122196, at *3 (S.D. Fla. Jan. 6, 2023) (noting a "documented history of Venezuela not engaging in service under the terms of the Hague Convention"); *Koch Mins. Sarl v. Venezuela*, 514 F. Supp. 3d 20, 34 (D.D.C. 2020) ("Venezuela has a documented history of playing a shell game: circumventing service by refusing to issue a certificate when the party to be served is the *same entity* that it has designated as its Central Authority." (emphasis in original)); *Trapote v. Venezuela*, 729 F. Supp. 3d 34, 36 (D.D.C. 2024) ("[The plaintiffs] hired an expert in foreign service, and she sent the appropriate documents, with Spanish translations, to the Central Authority for Venezuela via DHL.  Venezuela has not accepted service of the documents."); *ConocoPhillips Petrozuata B.V. v. Venezuela*, 628 F. Supp. 3d 1, 8 (D.D.C. 2022) ("Petitioners presented evidence that they had mailed and Venezuela received by April 29, 2019[,] everything necessary for the completion of service under the Hague Service Convention. But Venezuela has not certified their receipt of service, so service was not officially completed pursuant to the Convention."); *Lindsayca USA, Inc. v. de Venezuela*, 2022 WL 3588041 (S.D. Tex. Aug. 22, 2022), *report and recommendation adopted*, 2022 WL 4588588 (S.D. Tex. Sep. 29, 2022) (noting "[t]he evidence before me conclusively establishes that the Venezuelan Central Authority did not, as required by the Hague Convention, return a certificate of service confirming the service of the documents" and "Lindsayca's process server made several requests to the Venezuelan Central Authority seeking an update . . . but received no response. . . . Venezuela has not returned any status requests or certificates of service in more than [two] years."); *Ashburton Int'l Supply, S.L. v. Venezuela*, 2024 WL 4720605, at *3 (S.D. Tex. Sept. 2, 2024) (recounting that Venezuela's Central Authority "has not provided a certificate of service as required by Article 6 [of the Hague Convention]" and finding credible expert testimony that "Venezuela has not executed any Hague requests for service from the United States in over seven years and is unlikely to"); *Montaño v. Herrera*, 2023 WL 2644340, at *2 (S.D.N.Y. Mar. 27, 2023) ("The Venezuelan Central Authority did not decline to complete service in light of sovereignty or security concerns under Article [13] of the Hague Convention. Rather, it simply refused to accept the package. In addition, ABC Legal Services, has not been able to successfully have packages delivered to the Venezuelan Central Authority in the past three years.").

5

judges within the Eleventh Circuit have permitted alternate service on Maduro in at least five cases, including *Osio*.[3] (*See* docs. 11-1 & 11-2).

This Court cannot blind itself to the numerous issues with service of process through Venezuela's Central Authority that have plagued plaintiffs in the United States. And Rule 4(f) does not require the Court to do so:

> [T]here have been occasions when the signatory state was dilatory or refused to cooperate for substantive reasons. In such cases, resort may be had to the provision set forth in [Rule 4](f)(3).

FED. R. CIV. P. 4(f) advisory committee's note to 1993 amendment; *see also In re GLG Life Tech Corp. Sec. Litig.*, 287 F.R.D. 262, 266 & n.7 (S.D.N.Y. 2012) ("[N]othing in Rule 4(f) itself or controlling case law suggests that a court must always require a litigant to first exhaust the potential for service under the Hague Convention before granting an order permitting alternative service under Rule 4(f)(3)."); 4B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1134 & n.40 (4th ed. updated Sep. 2025) ("The only proscription on the district court's discretion under Rule 4(f)(3) is that the method not be prohibited by international agreement."); *accord Chanel, Inc. v. Lin*, 2009 WL 1034627, at *1 (S.D. Fla. Apr. 16, 2009) ("[T]he decision to issue an order allowing service by alternate means lies *solely within the discretion of the district court.*" (emphasis in original) (citing *Prewitt Enters., Inc. v. Org. of Petroleum Exporting*

---

[3] The dockets for these cases, all from the Southern District of Florida, are: *Marron v. Maduro*, No. 1:21-cv-23190-FAM; *Osio v. Maduro*, No. 1:21-cv-20706-DPG; *Holt v. Maduro*, 1:24-cv-20701-CMA; *Perez v. Maduro*, No. 1:24-cv-23719; *Heath v. Maduro*, 1:25-cv-20040-JB.

*Countries,* 353 F.3d 916, 921 (11th Cir. 2003); *Rio Props., Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1018 (9th Cir. 2002))).

Service via Venezuela's Central Authority in this case will be futile. The Court cannot find a single case in recent years where Venezuela's Central Authority has conducted service as the Hague Convention contemplates. Moreover, "the core function of service is to supply notice of the pendency of a legal action, in a manner and at a time that affords the defendant a fair opportunity to answer the complaint and present defenses and objections." *Henderson v. United States*, 517 U.S. 654, 672 (1996). And because of the futility of service through Venezuela's Central Authority, utilizing that mechanism is highly unlikely to provide notice at all. Indeed, recent cases demonstrate that the only accomplishment of attempting service through Venezuela's Central Authority will be to unnecessarily delay this case by several months, if not years. Requiring the Plaintiffs to attempt to proceed with service through Venezuela's Central Authority would be to subject them to a formalistic exercise in futility. The Court will not.

Because the Court finds that service via Venezuela's Central Authority is futile[4] and would cause unnecessary delay,[5] the Court concludes that alternate service is appropriate in this case by any means to which Venezuela has not objected and which satisfy due process.

Venezuela only objects to service via postal channels. *Venezuela Central Authority & Practical Information*, HAGUE CONF. ON PRIV. INT'L L., https://www.hcch.net/en/states/authorities/details3/?aid=280 (last visited, Dec. 17, 2025). The Court cannot find any other international agreement prohibiting service in Venezuela by other means.

---

[4] Courts have found that futility justifies alternate service in such cases. *See Henry F. Teichmann, Inc. v. Caspian Flat Glass OJSC*, 2013 WL 1644808, at *1 (W.D. Pa. Apr. 16, 2013) ("Because there is no reason to believe that service would be effective if Plaintiff was required to serve Defendant in accordance with the Hague Convention [(via Russia's Central Authority)] or that service by e-mail would violate an international agreement, alternative service . . . is facially permitted."); *Arista Recs. LLC v. Media Servs. LLC*, 2008 WL 563470, at *2 (S.D.N.Y. Feb. 25, 2008) ("Because there is no reason to believe that service would be effective if plaintiffs were required to serve MediaServices in accordance with the Hague Service Convention procedures [(via Russia's Central Authority)], substituted service pursuant to Rule 4(f)(3) is appropriate."); *Phoenix Process Equip. Co. v. Cap. Equip. & Trading Corp.*, 250 F. Supp. 3d 296, 306–07 (W.D. Ky. 2017) (permitting alternate service on Russian defendants where the plaintiff "established that Russia's Central Authority would not deliver any process sent to it" by, *inter alia*, a plethora of cases demonstrating that Russia's Central Authority refuses to serve process); *Sec. & Exch. Comm'n v. Dubovoy*, 2016 WL 7217607, at *2 (D.N.J. Dec. 13, 2016) ("[S]erving Slepenkov and Zakharchenko through means agreed upon by the Hague Convention would almost undoubtedly fail, and it is appropriate to authorize service by alternative means. To do otherwise would essentially thwart the Commission from ever being able to serve Slepenkov and Zarharchenko in this case."); *see also Cawthon v. Zhousunyijie*, 700 F. Supp. 3d 20, 31 n.3 (S.D.N.Y. 2023) (suggesting that alternate service on a foreign defendant in China would be permissible upon a showing that "service of process through [the Chinese Central Authority] would be futile"); *In re LDK Solar Sec. Litig.*, 2008 WL 2415186, at *3 (N.D. Cal. June 12, 2008) (permitting alternate service on defendants in China without first requiring attempts through the Chinese Central Authority where counsel of served defendants refused to accept service on behalf of others in China and stated that "it might be impossible" to serve them); *In re Mercedes-Benz Emissions Litig.*, 2019 WL 2913309, at *3 (D.N.J. July 2, 2019) ("[W]here Convention service is impossible or impractical, . . . courts will allow alternative service pursuant to Rule 4(f)(3).").

[5] Courts have similarly found delays via service under the Hague Convention as supportive of an order of alternate service. *See In re GLG Life Tech Corp. Sec. Litig.*, 287 F.R.D at 266 (collecting cases).

The Plaintiffs represent, with an accompanying declaration, that they have verified cell phone numbers and an email address for Maduro that are not publicly available.[6] (Doc. 9 at 10; doc. 9-7 at 1–2, paras. 3, 3(a)). However, that information was "current as of December 2021." (Doc. 9-7 at 2, para. 3). They have also provided Maduro's X and Facebook handles, as well as a WhatsApp number Maduro made public in 2020 via which they can send him direct messages that "do not bounce back." (Doc. 9 at 10; doc. 9-7 at 3, para. 4(a)).

Due process requires the use of methods of service that provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950). The Court is not satisfied that serving Maduro by text messages to his private cell phones or email is sufficient to provide notice here because the only information that Maduro was utilizing those points of contact is now four years old, and there have been at least five lawsuits against him where such service has been permitted and utilized, listed *supra* note 3, which have gone unanswered. As to Maduro's X and Facebook accounts, as well as his 2020 WhatsApp number, there is insufficient indication in the record that Maduro, an infamous public figure, has previously viewed—much less responded to—any direct messages from the public. Accordingly, the motion to serve Maduro by these channels is due to be DENIED.

---

[6] The Plaintiffs likewise represented they had such information for El Aissami. (Doc. 9 at 10). However, the declaration they submitted only asserts such as to Maduro. (*See* doc. 9-7).

9

The Plaintiffs also provided an X handle for El Aissami. (Doc. 9 at 11; doc. 9-7 at 4, para. 4(f)). The Court takes notice that El Aissami has not posted from that account since March 20, 2023. *See* Tareck El Aissami (@TareckPSUV), https://x.com/TareckPSUV. Further, United States Immigrations and Customs Enforcement lists El Aissami as a captured fugitive in the custody of Venezuelan authorities since April 2024. *El Aissami Maddah*, U.S. IMMIGR. & CUSTOMS ENF'T, https://www.ice.gov/most-wanted/captured/el-aissami-maddah-tareck-zaidan (last updated Sep. 23, 2025). Service via direct message thus appears inadequate to provide notice to him. Accordingly, the motion to serve El Aissami by this channel is due to be DENIED.

In sum, the Court finds that service by alternate means is appropriate in the present case. However, based on the information before the Court, the proposed means of email, text message, and direct message over social media are not reasonably calculated to apprise Maduro and El Aissami of this matter. Therefore, the Plaintiffs are directed to renew their motion, setting forth proposed means for alternate service with accompanying briefing, affidavits, declarations, or other pertinent information in support thereof.

## V. CONCLUSION

For the reasons stated, and for good cause, it is

ORDERED as follows:

1. The Plaintiffs' motion for alternate service of process (doc. 9) is GRANTED to the extent that alternate service on Maduro and El Aissami is appropriate in this case.

2. The motion is DENIED without prejudice as to the means proposed for alternate service.

3. The Plaintiffs shall file a new motion for alternate service specifying proposed means with accompanying briefing, affidavits, declarations, or other pertinent information in support thereof **on or before January 19, 2026.**

DONE this 18th day of December, 2025.

                                            /s/ Emily C. Marks
                                    EMILY C. MARKS
                                    CHIEF UNITED STATES DISTRICT JUDGE